Good afternoon. It's Dylan Kostlev for Petitioner Sutter Nguyen, and may it please the Court. He does prefer to be called Sutter, so that is why I refer to him as such in his brief. So here, Judge Hawkins, if I'm looking this way, am I looking at you, in case you have a question later? You're looking at me, guy. Okay. Sometimes they move the canvas around. I'm looking at your 28-page brief. I understand that. Approved? Excuse me? Was it approved? Yes, it was. And believe me, it put me in terror to put it before this Court. It's very, very hard to read, and didn't serve you well, to be frank. Go ahead. I think that the record that the State submitted here, and as you saw in their answer, they say essentially his fate is doomed. Back to the question, I understand that there is a comedy towards the State Forum, but there are federal rules that are promulgated to help the district court go through a record and do a meaningful review. Here, basically having spent almost a year reviewing this record, these 9,400 pages were out of order. But that is just one question. Extracting the evidence related to this client was a monumental task, but there were patterns and irregularities that kept coming up in this record that were difficult to ascertain and brought me back and back and back to this record again. I have continued to document what I have seen, and I will just put this before the Court. I have done so in a way to try to be as efficient as possible, but those irregularities have escalating concerns in this case, and would relate to any prejudice if there were something that you thought might make out in the error in this case. So as far as the uncertified versus certified issues, I want to just ask for your interest in what you would like to focus on, or for me to focus on. We are with the certified issue. Okay. Then if there's any, which of the uncertified issues you think are the most important? And particularly ones that don't have procedural problems would be better. Okay. Procedural problems as in? Fall exhaustion, et cetera. Okay. Yeah. The procedural default wasn't raised below, so if there is one, that's not something that's responding. D7's issue, obviously, I put the D1 concession up there, because I think that is an issue that appears to be foreclosed under normal circumstances. So that would be an issue that would be reviewable under D2, and that relates back to what I was talking about in terms of reviewing this record. You'll notice that I discussed the unique synergy between the prosecutor and defense attorney for Bruce, Donald Masuda, in terms of how this case was tried. That was one of the crippling things about reviewing this record, because you cannot put forth a theory or facts before a court unless you have proof to back it up. These eight months of proceedings, which, like I said, were out of order, when you put them together, I can prove that they acted together in concert to make Sutter appear more relevant. If that is something that you think is appropriate for review, I am prepared to present that to this court. That is one of the reasons I started down that road. I think also in terms of the factual findings, we put the two issues before there. The state court essentially just said, well, here are the same charges. That does not answer the question in terms of Taylor-Re-Maddox. If you can touch upon the D2 prong. And then the second question, which relates to this. Are we talking about the severance question? Yes. You said start with the certified issue. No, but I'm trying to understand. Yes. So what you're saying essentially is you understand that you can't, you don't have a D1 claim for severance because it's so clearly established Supreme Court law. Yes.  That would be the case. Unless they were saying even if Zapata leaves that open when Justice O'Connor said, if there's a specific trial violation that is violated by the joinder, then there might be that overarching due process principle at issue, which brings up all of the sort of fighting throughout the federal courts in this land about how broad is a principle that you can use under the ADPA. But assuming that there's not that gateway, then it would be a D2 question, or whether it can be aggregated for purposes of cumulative error review in this case. So then there's an embedded question, which is, can you use a D2 violation with respect to a constitutional theory that isn't the D1? Yes, I know you can for the cumulative error review. As far as D1, I would believe so because I'm just trying to think of an example because I know I looked this up. Because if it's de novo, right, then you can look at this court's law, and then you would have, well, the Sandoval and the Peters. And that's the question. That's the question. It's whether it could be it wasn't briefed as such exactly. Yeah, I know. I tried to look, and there's only about two or three cases. There's Maxwell Wright v. Roe that talks about the antecedent. If the antecedent factual finding is incorrect, then we go to de novo review. And then there was another one that was amended and altered, and so I couldn't quote it because it took some language out. But what's interesting, I think, and this relates to Panetti, which is the one Supreme Court case that made that statement. Justice Kennedy does something interesting in that case, and it relates to why there is so much, for better word, fighting about the ADPA right now, is there has been sort of a convergence since Williams with Teague and the ADPA criteria. So Justice O'Connor had three criteria and reasons. She distinguished it from Teague, and those three have been whittled and converged, and that's created this confusion. So if you look at Panetti, but Panetti in terms of the question of the de novo review, it was a D1 case, which is why it's a little bit odd. And then this court in Maxwell applied the de novo to a D2 and started citing Ninth Circuit cases. So I think it's an up-in-the-air question, but it would seem that if it's an unreasonable factual determination, if you don't go to being able to use Ninth Circuit or circuit precedent, then you would really be going back to D1 in a sense, but de novo. So I'm not sure that that would work. What was the harm to your client from failure to sue? An escalating harm that I've continued to put piece together, which is that he was sort of the hook for the gang, because if you look at the evidence, they did not know which gang was involved. So when Sutter's counsel asked the cop, he said, oh, you're whispering, you have to speak louder. She said, what did you see when you arrived at the crime scene? And he said, 30, a crowd of hostile, angry men wearing red. So there were only crips on trial in this case. And so when the two other men were caught right at the scene, as you know, the main guy who had the gun and the fingerprints on the gun had no gang connection that could be proved to this particular gang. This particular gang's name was not mentioned at the scene, unlike the prosecutor represented. There was no evidence this gang was involved. Wasn't there a cooperating witness that identified your client as being a member of the gang? You mean John Dyke, who was the immunized witness? Yes. Yes. He said he heard that he was. Answer my question. Yes. Yes, there was a witness, cooperating or not, that identified your client as a member of the gang, correct? That's correct. And he also said he got that information from Probation Officer Winfrey, who first denied ever talking to John Dyke and then said he did, and it came out. Again, what I'm looking for is a list of facts that could not have been, that were proven in a joint trial that could not have been proven in a separate trial. Could you list those for me? I could, and I think it would take, unfortunately, more briefing, because there was a coordinated strategy here. Do your five best. My five best would be that at an individual trial, first of all, the jury would have been given that instruction as a sua sponte duty that Bruce and Lamson are considered accomplices as a matter of law. And so, therefore, they could not have taken that advice from the prosecutor during closing that went to everybody puts Sutter at the scene because they would have only been left with motive, nothing to corroborate John Dyke in that sense, right? So that's a big piece right there, because that would have ended the split verdict potential of confusion. And in terms of how the trial was coordinated, and this was an eight-month procedure of how this was done, wrapping around every time Sutter's attorney, for example, she had information about she brought forth John Dyke's pending conviction and murder conviction. Then it came out that they couldn't tie the gun to him. So what the other attorneys did was continually hammer John Dyke about his pending murder conviction and focus on that gun. And then it came out that the gun that was supposedly tied to Sutter through another guy, there was a cold hit on it, and it came up months before it could have ever been Sutter's because he was in custody at that time. So that came up, but what they do is throughout this trial, the other two attorneys with the prosecutor go into diverting into John Dyke and other issues like a different charge to subterfuge what Sutter's attorney kept trying to do. If she was alone in a case, there would have been no self-defense issue. There would have been no imperfect self-defense. There would have been no these gangs are bad, this gang is bad, and they were all shooting. It would have simply been her saying, look, yes, Sutter had some contacts when he was 14. Yes, that is pretty much all that you can show here, but there's nobody here to identify him. But when you spend four months saying, and boy, and Sutter, and boy. There were several people who identified him. Well, boy was and wasn't. That's the other problem. He was dead, right? No, not only dead, but the other. I thought that they identified him as being there. They didn't identify him as shooting. But boy, of course. I thought Ross, the other, the co-defendants and John Dyke all said he was there. Right, but the co-defendants never brought it up until the trial. Until what? I mean, but they did say he was there. They did, and then they rejected it. And then they went and tried another trial, and he was there for some reason. Right, except that instruction that they would be accomplices in a matter of law would not have allowed what happened here. That's the challenge. But they weren't determined to be accomplices in that. Right, but the instruction isn't given when you're tried with somebody in California because it creates a confusion with accomplice liability. Can you, this is probably an extremely stupid question, but how was your client convicted of the murder but not the gun? What's the logic of this? What do you think? Or is he just using his verdicts that we're not supposed to worry about? I think the prosecutor directly argued as I showed in the reply for a compromise verdict. He said, go ahead and find John Dyke had a gun. Go ahead and find that, you know, he's an accomplice. It doesn't matter. Sutter had motive. We know he's a transgender boy who died and was not, you know, really tried here. And we know that, you know, everyone says he was there. Everyone meaning the two accomplices, as a matter of law, who could not be used under California law in a separate trial because they would have to give that suicide response. So the notion that this was how it occurred, that he could have been, he could have been guilty of the shooting? Well, that was the other thing. They tried to, when Sutter had a prelim hearing, right, they had separate prelims, the judge there had the prosecutor dismiss one of the great bodily injuries, firearm allegations, because she said if you can tie the bullets or you can exclude him from the bullet that went into the victim, then under California law you cannot use the group beating instruction or the group shooting where we can't tell who did it. The kill zone. There's aiding and abetting. They did that as well as a theory. But they did a group kill zone instruction, and the prosecutor asked for that sort of at the last minute and amended the charges to do lesser firearms enhancements to the other two defendants because they were fighting about who had the gun because John Dyke put it. So it's not, given the possibility of a group firearm, given the possibility of aiding and abetting, it's not a logical prediction, it's possible? It's still, it's not, it's compromised possible, but it's not logically possible because he didn't have a gun. So what would, his only act, according to any witness, right, is pulling out a weapon. So it's not saying anything. There was nothing that he said. There's no movement he made, no action that would basically encourage the act. Let's go for a minute because you have a little bit of time left. Okay. You do have an issue about the gang evidence. Yes. What did the State Supreme Court in the District Court say about that? Well, the State Supreme Court just denied release. Okay, argue the State Supreme Court. So the Court of Appeal came up with a factual reason that no one argued below, as I said in the brief, and that is contrary to the record directly. So what it tried to do was try to fit within the box of California law that says, you can only let in evidence from motive if there's no enhancement charged, if there's a rival or suspected rivalry. So that's what the prosecutor did and then turned around and said, no, there was no rivalry at all when the witnesses were put on. And then the California Court of Appeal inserted a different reason, which was that the gang that was actually at the party is, quote, allies with the, quote, ABC gang that dead boy was looking for. And that is directly contrary to the record. So they don't fit within the scheme of their own California law. And what they did was pull it in there on their own. But the evidence was partly just that these are rival gangs, but wasn't there some more specific evidence on this thing about if they say, you know, where are you from, that means we want to fight. But then there was a little, there was more than that, too, wasn't there in terms of identifying individual people. Was he identified as a gang member by this validation thing or by what? Well, Sonny was identified as a JV member, a JVP member, way back when he was 14. So five years before. Right. But the prosecutor only got it in and, as I showed in the reply brief, even four months later before Winfrey testified, the expert, the judge again reviewed his gang rulings and said, only let this in because you said there were witnesses who heard JVP at the scene. This gang that Chandra was tied to and the other two really weren't. And that they are rivals. Both turned out to be untrue. And the Elaine Stoops detective testified the only gang she heard in her investigation was another different gang named Insane Viet Boys that was involved. Police said there were a hospital crowd of 30 people in red, and the prosecutor shut down any questions about members who were wearing red, saying we know these were Crips gangs. This was JVP and this was LGC. And then when he was asked, you know, through seven different times to bring forth lists, he had no proof that the people like Tosin and Viet, who were on the other side, quote, victims, were members of that gang either. So we don't know what gang was involved here. And that's the link that Sutter provided because he could get in gang evidence, but if you look at the evidence, right, he starts out saying I'm not going to use boy. He whittles it down with his proffer. He brings back a dead person who was never identified by anybody until they get one girl who never told police for two years until trial and says, yeah, I saw boy in a car. And was basically impeached so much that she was then threatened with a perjury charge, and basically there was this bantering back and forth with her as the one witness. So this is what happened in this trial. We don't know what gang it was. The only person that testified against Sutter was somebody who was so heavily impeached that the judge said he lost credibility and lied so many times, was identified himself as the shooter, and Sutter was never identified by anybody else. So if there's any error at all, this paper-thin evidence, as Judge Gesency called him, Taylor here, is not only paper-thin, it's almost as unreliable as Maxwell. It just doesn't have that same habitual perjurer element that that case has here. Okay, thank you very much. Okay. I'll give you a minute. Thank you. May it please the Court, Justin Riley on behalf of the Court. On the severance issue, we can't get close to de novo review here because it is a D-1, and even the characterization that it should be a D-2 claim is simply a disagreement with the State Court's prejudice finding, and a prejudice finding is not a factual determination. It uses facts to be sure, but the petitioner does not point to a single fact that the State Court arguably got wrong, or so unreasonably wrong, that it should transform this case into de novo review. In disagreeing with the State Court's prejudice analysis, and by going through the entire record, what the petitioner is doing is making a legal, is arguing against their legal determination. Let's go over the facts just a little bit. Sure. Because, well, the last statement by Mr. Koslow is that this is a paper-thin case, and it looks like we had two, the two gang members, I think it's Lamson and Bruce, is that right? I think so. And did they or did they not implicate Mr. Quinn? They, it was like initially they said he was there, or actually fired, and later didn't state that. And I guess I just want to find out your view. What's the most, what was the compelling case that you think that the jury relied on and found Mr. Quinn guilty? I don't know what the jury was thinking. I shouldn't even begin to guess. Well, what's the main facts that you think that supports the conviction? I think this was a big gang mess. I think there were converging and diverging stories from pretrial onward. I think every single witness, every single pretrial statement was either contradicted or changed. Any facts against Mr. Quinn? Oh, he is, he was placed at the scene, both pretrial and at trial. By two of the co-defendants? Two of the co-defendants placed him at the scene, and John D. placed him at the scene and actually placed a gun in his hand. Both co-defendants at trial changed their stories to, we saw him there, but he didn't have a gun. And that's, by the way, why the jury may have determined, oh, he wasn't armed. Everybody at trial testified he didn't have a gun. There was a cooperator, though, too, right? That was John D., yes. That was Mr. D. Yes, and John D. made a pretrial statement that the petitioner here was actually shooting and actually shot one of the victims, but then later at trial changed his story and said, no, no, no, I didn't see him with a gun. Were any of the defenses, or were there mutually antagonistic defenses present? No. There were identical charges. The co-defendants put on a self-defense for defense of others, a style defense. And then to the extent they referenced the petitioner at all, it was, oh, yeah, he was also there without a gun. They were all very careful to say a petitioner did not have a gun. This is the kind of case that the prosecution almost has to try together because if you separate out these defendants, they climb up and they start pointing their fingers at each other, and truth is actually obfuscated. But the combination probably helped the petitioner here. Was there any difference in the accomplice instruction or lack thereof as the appetizer? No. Accomplice instructions were given in this case with regard to the co-defendants and John D. It's a factual determination, and so the trial court gave the accomplice instructions, which do not tell the jury to disregard the justification. You just tell that they didn't because you don't do it with their co-defendants. That's just wrong. I'm sorry. It was given with regard to John D. Was he wrong? All right. It wasn't. And if they had been tried separately, it could have been given with regard to the co-defendants. That's true, and it only tells the jury to disregard. No, when I ask you a question, you must answer it. I'm sorry, yes. Appropriately, okay. Yes. And the jury instruction would simply tell the jurors to look for corroborating evidence, which in denying the claim that the instruction should have been given with regard to the co-defendants, the trial court did find that there was corroborating evidence for John D. Can I ask you a question? Yes, yes. How about this? Is there any race testimony? Can you talk about that? I'm sorry? Is there any race testimony? Oh, okay. That's an uncertified issue, and under this circuit's Rule 9-22, I'd like the opportunity to brief that if the court's inclined. I do know that Winfrey was a gang expert and testified with regard to who were gang members, gang member practice. So if Your Honor has a specific question. Well, you just said this was a gang mess, and so I'm describing this, and so there is this whole challenge to the gangs involving Mr. Winfrey. I just thought I'd give you an opportunity to talk about it if you wanted. Oh, I'm sorry. Not specifically on the admission of evidence, but the ‑‑ I'm sorry, I can't see. There's testimony. I mean, I must say that all the gang evidence also sometimes gives me green bones. He was a validated gang member. That means that by some police accounting system, the police thought he was a gang member. Yes. But what kind of testimony is that? We think you're a gang member. That's evidence you're a gang member. We think you're a gang member. That was a tech question. There was two things in the tech question. Well, he was not charged with being a gang member, so it's not as ‑‑ But it was testimony that he was a validated gang member. Yes, for purposes of showing motive. I understand that, but what does it mean that he's a validated gang member? I mean, does that the police have him on a list of being a gang member? And so when a rival gang has their party ‑‑ Well, I understand that, but ordinarily, except in the gang world, you don't tend to have policemen getting up and testifying to say, you know, we believe this guy is X or Z because we have a list of criteria. You know, we think this guy's a drug dealer because we have a list of criteria by which we decide he's a drug dealer. If he was being charged with being a gang member, that may be a different analysis. Why? When there was testimony that he was ‑‑ the testimony was if somebody says a validated gang member, certainly the jury's going to think that this is authoritative. But, in fact, it's a judgment by the police. Yes. Was there an objection to that? Objection to the ‑‑ Testimony that he's a validated gang member. I do not remember this specific objection. I'd love to answer any other questions. Why don't we brief him on any of the uncertified questions. We'll let you know. Thank you. Thank you. I just want to focus on a couple of things. We're talking about whether Sutter or not was a validated gang member. The issue is, even if he was, was this the gang that did the shooting here? Is he guilty? That's the question. Is he guilty of being a low‑level gang member, which Tang and Winfrey even said themselves. You know, somebody who was when he was 14, that's in low ties. But the other thing I would like to ask is, you know, with the ADPA as narrow as it is, there's only one guarantee for a defendant that's promised, which is a meaningful review. And here what you have is a state that submitted none of the briefs that are required by a rule that's been in place for two decades, through 9,400 pages out of order, that it would take a savant to get through, and even then, maybe not do a great job. But it is incredibly difficult, and for a district court that's incredibly busy in this case, to say that the comity given to a state is so strong that there's no collegial respect of having to follow the federal rules to give a meaningful review, seems to me odd that it gets to then bypass you, pass the COA unit. A separate claim of some kind? No, I'm just trying to say that, you know, in terms of him raising the 922 rule issue that bypassed, you know, certain certification procedures, I think this all ties into this case and the challenge with this record is what I'm trying to get at. Okay, thank you very much. Thank you. And I'd love to hear your arguments in Quinn v. Hilder and who are your cases that you would like to review.
judges: Hawkins, Berzon, Murguia